IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RBAHTDSR, LLC, t/a REHOBOTH BEACH ANIMAL HOSPITAL, LLC, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 19-1280-RGA |
| PROJECT 64 LLC, JOHN M. WIERTEL and GEOFFREY GRAHAM, | ) ) ) ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

Presently before the Court in this contract dispute is a motion to dismiss the claims in the operative Complaint, filed by Defendants Project 64 LLC, John M. Wiertel and Geoffrey Graham (collectively "Defendants"), pursuant (at least in significant part) to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). (D.I. 5) For the reasons set forth below, the Court recommends that Defendants' Motion be GRANTED-IN PART and DENIED-IN-PART.

**I.   BACKGROUND**

**A.   Factual Background**

Plaintiff RBAHTDSR, LLC ("Rehoboth Beach Animal Hospital" or "Plaintiff") is a Delaware limited liability company located in Rehoboth Beach, Delaware; it has been in the business of "providing veterinarian care services" since 2009. (D.I. 1, ex. A at ¶ 1) Non-party Dr. Timothy Dabkowski ("Dr. Dabkowski") is the sole member of Plaintiff and is a resident of Delaware. (D.I. 1 at ¶ 4)[1]

---

[1] Also pending is Plaintiff's motion seeking to amend the Complaint ("motion to amend"), (D.I. 12), in which Plaintiff seeks to add Dr. Dabkowski as a named Plaintiff, (D.I. 13, ex. 2 at 1 & ¶ 2), and to include certain new allegations and claims.

1

Defendant Project 64 LLC ("Project 64") is an Ohio limited liability company located in Cleveland, Ohio. (*Id.*, ex. A at ¶ 2) It is in the business of "providing architectural design and project management services" for veterinary care facilities. (*Id.*) Defendant John M. Wiertel ("Mr. Wiertel") is a resident of Ohio and is the principal owner, managing member, and registered agent of Project 64. (*Id.* at ¶ 3) Defendant Geoffrey Graham ("Mr. Graham") is also a resident of Ohio and is a principal owner and managing member of Project 64. (*Id.* at ¶ 4)

In early 2017, Plaintiff and Defendants entered into a contract (the "Contract") under which Defendants were to provide various services relating to the eventual construction of Plaintiff's new veterinary facility (the "Project"). (*Id.* at ¶ 6; *see also id.* at ex. "A" (hereinafter, "Contract"))[2] More specifically, pursuant to the Contract, Defendants were to "[p]rovide design consultation, management, and cost budgeting services to best allocate approximately $750,000.00 construction dollars [the "Total Cost Estimate"] into an efficient, revenue-generating veterinary care facility." (Contract at 1) Plaintiff alleges that the parties to the Contract agreed that while "the Total Cost Estimate was not an exact amount" the ultimate construction cost would "*not* exceed . . . $800,000[.]" (D.I. 1, ex. A at ¶ 8 (certain emphasis omitted) Under the Contract, Plaintiff was to pay Project 64 a total of $118,000; such payments were to be spread out over five installments that were tied to the completion of certain milestones. (Contract at 4; D.I. 1, ex. A at ¶ 7)

In March of 2017, Project 64 presented to Plaintiff "preliminary designs . . . which were approved by [Plaintiff] without any substantial modifications[.]" (D.I. 1, ex. A at ¶ 12) On March 6, 2017, "[a]fter the preliminary designs were approved, the Parties formally executed the

---

[2] Plaintiff included an unsigned version of the Contract as an exhibit to the Complaint.

2

Contract, reconfirming their agreement to the conceptual design[.]" (D.I. 1, ex. A at ¶ 12; *see also* D.I. 6, ex. 1 ("Executed Contract"))[3] After the Contract was executed, Defendants began preparing certain construction documents and soliciting bids. (D.I. 1, ex. A at ¶ 13)

By mid-2018, Defendants began to receive bids for the Project. Defendants received three bids in total—for $2,063,467, $1,488,199 and $1,630,600, (*id.* at ¶¶ 13(a)-(c))—all well above the "approximately $750,000.00" Total Cost Estimate figure referenced in the Contract, (*see id.* at ¶ 14; *see also* Contract at 1). Allegedly, Defendants "did not solicit any additional bids . . . because [they] knew the designs were defective and that the Project could not be built within a reasonable approximation of the Total Cost Estimate." (D.I. 1, ex. A at ¶ 15) Plaintiff also alleges that "[b]ecause [Project 64] did not obtain a suitable bid within [Plaintiff's] known budgetary constraints, [Plaintiff] was forced to abandon the Project." (*Id.* at ¶ 16)

Plaintiff alleges that Defendants' conduct caused it to suffer damages. These damages purportedly came in the form of: (1) monies paid to Project 64 under the Contract for the provision of project designs that Plaintiff says were unusable, because they could not be built within Plaintiff's budget constraints; and (2) costs associated with the purchase and development of the property on which the Project was to be built (the "Property"), which Plaintiff is currently marketing for sale. (*Id.* at ¶¶ 18-22)

Any further relevant facts will be set out as needed in Section III.

**B. Procedural History**

On May 16, 2019, Plaintiff filed the Complaint in the Superior Court of the State of Delaware. (D.I. 1, ex. A) On July 9, 2019, Defendants removed the case to this Court on the

---

[3] Defendants attached the executed version of the Contract as an exhibit to their opening brief. (D.I. 6, ex. 1)

3

basis of diversity jurisdiction, pursuant to 28 U.S.C. § 1332. (D.I. 1 at ¶¶ 2, 9) On August 2, 2019, Defendants filed the Motion. (D.I. 5) Briefing was complete on the Motion on September 19, 2019,[4] (D.I. 11), and the Motion was referred to the Court for resolution by District Judge Richard G. Andrews on October 3, 2019, (D.I. 15).

## II. LEGAL STANDARDS

With one exception (further explained below), Defendants' Motion is brought pursuant to Rule 12(b)(6). Pursuant to Rule 12(b)(6), a party may move to dismiss a plaintiff's complaint based on the failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The sufficiency of pleadings for non-fraud cases is governed by Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2).

When presented with a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court conducts a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the court separates the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions." *Id.* at 210-11. Second, the court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

---

[4] On September 24, 2019, Plaintiff filed the motion to amend, (D.I. 12), and a proposed First Amended Complaint, (D.I. 13, ex. 2). Plaintiff's motion to amend, which is also referred to the Court for resolution, (D.I. 15), will be addressed in a forthcoming Report and Recommendation.

4

556 (2007)). In assessing the plausibility of a claim, the court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Fowler*, 578 F.3d at 210 (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

## III. DISCUSSION

Plaintiff brings two Counts: Count I's claim for "Breach of Contract[,]" (D.I. 1, ex. A at ¶¶ 24-30), and Count II's claim for "Professional Negligence/Malpractice[,]" (*id.* at ¶¶ 31-37). Defendants move to dismiss both Counts. Below, the Court will separately analyze the Motion as it relates to each Count.

### A. Breach of Contract (Count I)

Count I is a claim for breach of contract brought against Project 64 only. Pursuant to Delaware law, which is at issue here, a plaintiff states a breach of contract claim by alleging facts that support the following elements: (1) the existence of a contract; (2) the breach of an obligation imposed by that contract; and (3) resultant damages to the plaintiff. *Pharm. Corp. of Am. v. Askari*, Civil Action No. 16-1123-RGA-MPT, 2018 WL 2108200, at *5 (D. Del. May 7, 2018); *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 883 (Del. Ch. 2009). Defendants argue for dismissal of this Count on three grounds, which the Court will assess in turn.

#### 1. Standing

First, Defendants argue that Plaintiff does not have standing to sue. A challenge to standing is properly framed as a challenge to the Court's subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1).[5] *See, e.g., Johnson v. U.S. Bancorp*, Civil Action No.

---

[5] Defendants do not cite to Rule 12(b)(1) in their briefing.

5

10-1072-LPS, 2012 WL 1133689, at *1 (D. Del. Mar. 30, 2012). Motions brought under Rule 12(b)(1) may present either a facial or factual challenge to the Court's subject matter jurisdiction. *Id.* In reviewing a factual challenge, like the one at issue here, the Court is not confined to the allegations of the Complaint, and the presumption of truthfulness does not attach to the allegations in the Complaint. *See Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977); *Johnson*, 2012 WL 1133689, at *1. Instead, the Court may consider evidence outside the pleadings, including affidavits, depositions and testimony, to resolve any factual issues bearing on jurisdiction. *See Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997); *Johnson*, 2012 WL 1133689, at *1. Once the Court's subject matter jurisdiction over a complaint is challenged, the plaintiff bears the burden of proving that jurisdiction exists. *See Mortensen*, 549 F.2d at 891; *Johnson*, 2012 WL 1133689, at *1. The plaintiff must do so by a preponderance of the evidence. *GBForefront, L.P. v. Forefront Mgmt. Grp., LLC*, 888 F.3d 29, 35 (3d Cir. 2018); *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 288-90 (3d Cir. 2006).[6]

Defendants argue here that Plaintiff lacks standing because "[Dr.] Dabkowski signed the contract documents" at issue, and further because he did so "in his individual capacity" and "without regard . . . to [his] role, title or alleged function with Plaintiff." (D.I. 6 at 6-7; *see also* Executed Contract at 5) The Court, however, disagrees that Plaintiff's pleading is deficient on this ground.

---

[6] In assessing its jurisdiction, a court can evaluate the evidence "without an evidentiary hearing so long as [it] has afforded the parties notice and a fair opportunity to be heard." *McCann*, 458 F.3d at 290 (internal quotation marks and brackets omitted). Neither side requested an evidentiary hearing to resolve the standing issue, *see id.*, and so the Court will resolve this issue on the papers.

Instead, for three primary reasons, the Court concludes that, by a preponderance of the evidence, Plaintiff has established that Dr. Dabkowski signed the Contract in his representative (and not individual) capacity—i.e., on behalf of Plaintiff, the entity that brings this suit. First, the first page of the Contract itself lists the "Client" as "RBAHTDSR, LLC" (and only lists Dr. Dabkowski's name underneath that designation). (Executed Contract at 1) Second, in the portion of the Contract where Dr. Dabkowski signed, indicating acceptance, it is stated that once signed, "this proposal will become the basis for all services between PROJECT 64 *and the Client*." (*Id.* at 5 (certain emphasis added, certain emphasis omitted)) And third, Plaintiff has pleaded (and Defendants do not here dispute) that *Plaintiff* has performed its obligations under the Contract, including by making certain payments to Project 64. (*See e.g.,* D.I. 1, ex. A at ¶¶ 6-7 ("[Rehoboth Beach Animal Hospital] made payments to [Project 64] totaling . . . $108.682.50[.]")) This all provides sufficient evidence for the Court to conclude that Plaintiff was the party to this Contract, and that Dr. Dabkowski simply signed the Contract as Plaintiff's agent. *Cf. REI Holdings, LLC v. LienClear - 0001, LLC*, Civil Action No. 18-1401-MN, 2019 WL 3546881, at *8 (D. Del. Aug. 5, 2019) (noting that, pursuant to Delaware agency law, an individual defendant signs a contract in his representative capacity "as long *as somewhere in the contract* it is made clear that it is between the principal and a third party") (emphasis added); *Brandt v. Rokeby Realty Co.*, No. C.A. 97C-10-132-RFS, 2004 WL 2050519, at *10-11 (Del. Super. Ct. Sept. 8, 2004) (concluding that the defendant, who was the president of the co-defendant realty company, could not be liable under a contract theory, *inter alia*, because the contract at issue, while signed by the individual defendant, stated that it was between the plaintiff and the defendant realty company). In light of this, Defendants' standing argument cannot support dismissal of Count I.

### 2. Lack of Plausible Allegations of Breach of a Valid Contractual Obligation

Second, Defendants assert that Plaintiff has not plausibly alleged the existence of a valid contractual obligation that was breached. Plaintiff's theory of breach, set out in the Complaint, is that Project 64 "had a contractual duty to design the Project so that it could be completed within a reasonable approximation of the Total Cost Estimate, which was not to exceed $800,000." (D.I. 1, ex. A at ¶ 25; *see also* D.I. 8 at 13 ("[A] reasonable person would conclude, based upon [the] plain language of the Contract, that [Project 64] breached the Contract by . . . failing to furnish suitable designs so that a veterinary care facility could be built within a reasonable approximation of $750,000.00.")[7] Defendants, for their part, acknowledge that the Contract stated that Project 64's role was to "[p]rovide design consultation, management, and cost budgeting services to best allocate approximately $750,000.00 construction dollars into an efficient, revenue generating veterinary care facility[,]" (Contract at 1 (emphasis omitted) (cited in D.I. 6 at 9)), but argue that "[n]owhere in the contract is it stated, or even implied, that the cost of the project would not exceed $750,000 or $800,000"; they assert that the Contract never guaranteed that "once the project was bid out, [] the cost of the project would come within the amount of money that Defendants agreed to 'best allocate[,]'" (D.I. 6 at 9).

Pursuant to Delaware contract law, if a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an

---

[7] Plaintiff attaches certain exhibits to its answering brief, (D.I. 8, ex. 2), to support its argument that Project 64 had a contractual obligation to design a facility within a budget of $750,000 (or $800,000). (D.I. 8 at 13; *see also id.* at exs. 1-2). The Court will not address these documents in its analysis of this portion of the Motion, which is brought pursuant to Rule 12(b)(6), since the documents in question were not attached to or referenced in the Complaint. *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006); (*see also* D.I. 11 at 3).

ambiguity. *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). But when there is uncertainty in the meaning and application of contract language, the reviewing court must consider any extrinsic evidence offered in order to arrive at a proper interpretation of contractual terms. *Id.* A contract is ambiguous when its provisions are fairly susceptible to different interpretations or may have two or more different meanings. *Id.* And here, contrary to Defendants' argument, (D.I. 6 at 8-9; D.I. 11 at 4-5), the Contract is not unambiguous in Project 64's favor. Instead, its language referenced above could well have amounted to a requirement that the Project would (absent further alteration by Plaintiff) not exceed approximately $750,000 in scope. And thus Project 64's alleged conduct—charging for and receiving payments for services "up [to] and including the Contract Document phase of the Project" (i.e., nearly the entirety of Project 64's to-be-charged fees), at a point when no contractor had been selected, and no proposed contractor had even bid less than $1.48 million for the Project—could well plausibly amount to a breach of that Contract. (D.I. 1, ex. A at ¶¶ 13, 18; *see also* D.I. 8 at 15)[8] As such, this ground cannot support grant of the Motion as to Count I.

### 3. Damages

Third, Defendants assert that Plaintiff has not plausibly alleged that it suffered damages due to breach. To that end, in their briefing, Defendants challenge the validity of some of the categories of damages set out in the Complaint (i.e., damages relating to settlement-related costs associated with the purchase of the Property, or damages relating to certain approvals and to civil

---

[8] Of course, the Contract's language and any relevant extrinsic evidence all might eventually not add up to a breach here. The Contract is certainly no model of clarity. And Defendants note that there are sections of the Contract that could be read to suggest that any bids obtained from contractors were starting points, not ending points, for a discussion of what the final construction cost would be. (D.I. 6 at 9 (citing Contract at 3); *see also* D.I. 11 at 5 (same)) This will all be grist for the mill as the case moves toward a dispositive stage.

engineering costs associated with readying the Property for construction). (D.I. 6 at 10-11; D.I. 11 at 6; *see also* D.I. 1, ex. A at ¶¶ 28(b), 29) But in the Complaint, Plaintiff *also* alleges damages resulting from payments made to Project 64 pursuant to the Contract. (D.I. 1, ex. A at ¶¶ 18, 28(a)) Defendants do not appear to dispute that the allegations as to the latter type of damages are plausible. Thus, Count I cannot be dismissed on this ground.

**4.     Conclusion**

For the above reasons, the Court recommends that Defendants' Motion be denied as to Count I.

**B.     Negligence (Count II)**

In Count II, Plaintiff brought a claim against all Defendants[9] titled "Professional Negligence/Malpractice[,]" which the Court understands to be a cause of action for negligent misrepresentation pursuant to the Restatement (Second) of Torts § 552 ("Section 552"). (D.I. 1, ex. A at ¶¶ 31-37; D.I. 8 at 16-18; *see also* D.I. 11 at 7-8) Section 552 provides:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1) (Am. Law. Inst. 1977). In Delaware, however, where (as here) a plaintiff seeks solely economic damages regarding a negligent misrepresentation

---

[9]     In their opening brief, Defendants moved to dismiss this Count as to Mr. Wiertel and Mr. Graham pursuant to the corporate immunity doctrine. (D.I. 6 at 16-17) In its answering brief, Plaintiff did not argue in opposition to that request, asserting instead that it would seek to add additional claims against those Defendants via its later-filed motion to amend. (D.I. 8 at 19) For that reason, the Court recommends that Defendants' motion for dismissal of these two Defendants as to Count II be GRANTED.

claim, the economic loss doctrine would preclude the plaintiff's ability to recover in tort, unless the plaintiff can demonstrate the following two elements: (1) the defendant supplied the information to plaintiff for use in business transactions with third parties; and (2) the defendant is in the business of supplying information. *Kuhn Const. Co. v. Ocean & Coastal Consultants, Inc.*, 844 F. Supp. 2d 519, 527 (D. Del. 2012) (citation omitted); *Millsboro Fire Co. v. Const. Mgmt. Servs., Inc.*, C.A. No. 05C-06-137 MMJ, 2006 WL 1867705, at *2 (Del. Super. Ct. June 7, 2006).[10]

The focus of the parties' dispute here is on the second element of a negligent misrepresentation claim: whether Plaintiff has sufficiently pleaded that Project 64 is "in the business of supplying information." (D.I. 6 at 14; D.I. 11 at 7) In determining whether a defendant is "in the business of supplying information" for purposes of Section 552, Delaware courts have held that when "information is the 'end and aim' product of a defendant's work, there is the potential for liability." *Delaware Art Museum v. Ann Beha Architects, Inc.*, Civil Action No. 06-481-GMS, 2007 WL 2601472, at *2 (D. Del. Sept. 11, 2007); *see also Guardian Const. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378, 1386 (Del. Super. Ct. 1990).

---

[10] In Count II, Plaintiff alleges that Project 64 was required, *inter alia*, to perform a number of duties pursuant to the Contract, including the preparation of "the designs for the Project so that it could be completed within a reasonable approximation of the Total Cost Estimate"; Plaintiff asserts that, due to the lack of necessary training, education and appropriate licensure, Project 64 "grossly underestimat[ed] the Total Cost Estimate, resulting in designs that were unusable despite [Plaintiff] paying significant sums for their preparation." (D.I. 1, ex. A at ¶¶ 32-36; *see also* Contract) In other words, it appears Plaintiff is alleging that: (1) the false information that Project 64 supplied to Plaintiff was Project 64's advice and representation that "a new revenue-generating veterinary facility could be built within a reasonable approximation of $750,000[,]" (D.I. 8 at 18); (2) this information was to be used in business transactions with third parties (presumably, third parties who would be responsible for bidding on and constructing the veterinary facility) and (3) this led to damages suffered, *inter alia*, in the form of monies paid to Project 64 (as to a project that could never actually move forward, because it was more expensive than Project 64 represented it would be).

11

Conversely, where the information supplied is "merely ancillary to the sale of a product or service in connection with the sale," then the defendant will not be considered to be an information provider. *Delaware Art Museum*, 2007 WL 2601472, at *2 (internal quotation and citation omitted); *see also Christiana Marine Serv. Corp. v. Texaco Fuel & Marine Mktg.*, No. Civ. A. 98C-02-217WCC, 2002 WL 1335360, at *7 (Del. Super. Ct. June 13, 2002). Delineating when information is the "end and aim" of defendant's work versus when it is "ancillary to it" is a "'precise, case-specific inquiry[.]'" *Christiana Marine*, 2002 WL 1335360, at *6-7 (quoting *Rankow v. First Chicago Corp.*, 870 F.2d 356, 360 (7th Cir. 1989)); *see also Delaware Art Museum*, 2007 WL 2601472, at *2.

The Court has reviewed the case law in this area (both the cases cited by the parties and cases the parties did not cite), including opinions from Delaware state courts and opinions of this Court interpreting the relevant Delaware law. The underlying law as to this issue is sometimes difficult to parse. As a result, the Delaware state and federal precedent is not always uniform in its analysis—particularly as applied to cases (like this one) where the work of the defendant bears at least some relation to a current or future construction project. Thus, in these circumstances, the process of determining whether a business "cross[es] the line into the world of 'supplying information'" is "anything but [a] clear" one. *Christiana Marine*, 2002 WL 1335360, at *7.

In the Court's view, the opinions that best set out how Delaware state courts (and ultimately, were it called to analyze the issue, the Delaware Supreme Court) interpret what the "end and aim" of a defendant's work is in such cases are *Christiana Marine Serv. Corp. v. Texaco Fuel & Marine Mktg.*, No. Civ. A. 98C-02-217WCC, 2002 WL 1335360 (Del. Super. Ct. June 13, 2002) and *Danforth v. Acorn Structures, Inc.*, Civ. A. No. 90C-JN-30, 1991 WL 269956

12

(Del. Super. Ct. Nov. 22, 1991). *Christiana Marine* and *Danforth* are some of the first Delaware state cases to describe in detail how Delaware courts should assess this question; in doing so, they draw heavily on Illinois state case law for guidance. From these opinions, one can discern that "manufacturers and sellers who deal only in tangible products are generally not in the business of supplying information[,]" and that while "businesses that supply tangible goods and/or non-informational good[s] or services may [sometimes also] exchange information, [that] information relates only to the goods or services, and, thus, is supplied incidental to the sale of the product." *Christiana Marine*, 2002 WL 1335360, at *6-7 (citing *Rankow*, 870 F.2d at 364; *Tolan & Son, Inc. v. KLLM Architects, Inc.*, 719 N.E.2d 288, 296 (Ill. App. Ct. 1999)) (internal quotation marks, citations and alterations omitted).[11] On the other hand, these opinions instruct that some businesses are "pure information providers" (such as "accountants, lawyers, insurance brokers, stockbrokers, real estate brokers, [] termite inspectors and environmental assessors") that are clearly "in the business of supplying information for the guidance of others." *Id.* at *7 n.50 (citing *Tolan*, 719 N.E.2d at 296) (internal quotation marks and citations omitted).

Project 64's work for Plaintiff here, at least based on the record the Court can consider, appears to have been varied. On the one hand, Plaintiff alleges that among the other duties it performed, Project 64 "assisted [it] in selecting and evaluating a suitable location for the Project." (D.I. 1, ex. A at ¶ 9) And the Contract's "Project Summary" describes how Project 64 was to provide "design consultation, management and cost budgeting services[.]" (Contract at

---

[11] *See also Danforth*, 1991 WL 269956, at *3 ("Obviously, a great many businesses involve an exchange of information as well as of tangible products—manufacturers provide operating or assembly instructions, and sellers provide warranty information of various kinds. But if we ask what the product is in each of these cases, it becomes clear that the product (a building, precipitator, roofing material, computer or software) is not itself information, and that the information provided is merely incidental.") (quoting *Rankow*, 870 F.2d at 364).

13

1). These allegations make it seem like Project 64 was merely a "design consultant[] that provided advice on how to best allocate $750,000 to build the new veterinary facility[,]" (D.I. 8 at 17), and thus that it was simply a provider of information and advice.[12] Yet on the other hand, the Contract also appears to have required Project 64 to furnish design drawings of the veterinary facility and construction documents related to the facility, and to play a role in verifying that construction activities on the Project were successfully completed by the contractors. (D.I. 1, ex. A at ¶¶ 11-13; Contract at 2-3) Pursuant to Delaware law, the "end and aim" of that type of work could be seen as not the provision of information, but the creation of an ultimate, tangible end product (i.e., the construction of the facility itself).[13]

In the end, with the exact nature and extent of Project 64's work unclear, but with at least some facts pleaded to suggest that it is plausible that Project 64 could be considered an information provider under the law, the Court recommends that Defendants' Motion as to Count

---

[12] *See Tolan*, 719 N.E.2d at 298 (noting that "if an architect or engineer is engaged solely to provide information based upon an evaluation[,] and the value of the services lies in its analytical work rather than a tangible end product, it could be considered to be in the business of supplying information"); *see also Council of Dorset Condo. Apts. v. Dorset Apts.*, CIVIL ACTION NUMBER 90C-10-269, 1992 Del. Super. LEXIS 343, at *7-8 (Del. Super. Ct. Aug. 26, 1992) (concluding that summary judgment should be denied as to a negligent misrepresentation claim, where defendants, who prepared an engineering report for an apartment complex that was used to evaluate the extent of cracking in the complex, could be considered to be information providers, as they "prepared information to be used as information").

[13] *See Kuhn Const.*, 844 F. Supp. 2d at 529 ("[T]he current weight of authority suggests that . . . the provision of plans and drawings in connection with a construction project is considered to be information that is incidental to the sale of a finished, tangible product."); *Millsboro Fire Co.*, 2006 WL 1867705, at *2-3 (concluding, at summary judgment, that defendant architects and designers were not mere information providers, because they provided "plans and design drawings used to construct" a fire hall); *Tolan*, 719 N.E.2d at 298-99 (affirming dismissal of claims against defendants, an architect and soil engineer, after determining they were retained not to "provide an analytical end product" but rather to perform inspection work that was used in the actual construction of townhomes).

II be denied with regard to Project 64. *Cf. RLI Ins. Co. v. Indian River Sch. Dist.*, Civil Action No. 05-858-JJF, 2006 WL 1749069, at *3 (D. Del. June 20, 2006) (denying a motion to dismiss a negligent misrepresentation claim, where it was "not clear" that the defendant designers and architects were not in the business of supplying information, and where the complaint alleged that the defendants had "provided information regarding the progress of" a contractor's work in renovating a high school).[14]

## IV. CONCLUSION

For the foregoing reasons, the Court recommends that Defendants' Motion is GRANTED-IN PART and DENIED-IN-PART. More specifically, the Court recommends that Defendants' Motion be DENIED as to Count I. It recommends that the Motion be GRANTED as to Count II as to Mr. Wiertel and Mr. Graham, but DENIED as to Count II with regard to Project 64.[15]

Plaintiff indicated that it would amend its Complaint in response to certain arguments raised by Defendants, (D.I. 8 at 19), and, as noted above, has moved to amend, (D.I. 12). The Court will address the viability of any claims sought to be added via the motion to amend when it resolves that motion.

Dated: March 6, 2020

*[signature]*

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

---

[14] In their opening brief, Defendants had argued that the "Gist of the Action" doctrine precluded Plaintiff's negligence claim, (D.I. 6 at 11-12), in that it provided an additional hurdle to whatever constraints Delaware law imposes to liability under Section 552. However, because Defendants did not press the "Gist of the Action" argument in their reply brief, the Court understands them to have abandoned it. *Cf. Blakeman v. Freedom Rides, Inc.*, Civil Action No. 12-416-LPS-CJB, 2013 WL 3503165, at *13 (D. Del. July 10, 2013) (citing cases).

[15] Plaintiff's request for oral argument is DENIED. (D.I. 20)